We have one case this afternoon in Re Erik Brunetti. We've allotted 15 minutes aside, but the panel anticipates that we'll allow extra time, so let's not rush things. John Sommer and Devin Beckwith for Appellant Erik Brunetti. The government has attempted to justify this restriction on speech. You've read its brief. You've read my brief. I think you understand my viewpoint on those things. Unless the court has questions, I'm interested in hearing if the government has anything new to say. Well, I suppose we were to construe this statute somewhat narrowly. I mean, you make the point in your brief that in the past the PTO has construed immoral and scandalous to reach some of the same things that would have been covered by the disparagement clause, and to the extent that the PTO has done that, presumably that's improper under the Tam case. Suppose we were to construe it more narrowly to reach indecent speech, sort of indecent speech that was involved in Pacifica. Would that make a difference? Well, it won't make a difference because the first thing is Congress hasn't written that statute, and I don't think this court is given the authority to rewrite a statute. You want to rewrite a statute, and we are given the authority to construe statutes to avoid constitutional questions. Well, another way of saying let's assume it was so construed, and I sort of refer to it as the PES marks. The government refers to profane, excreditory, and sexual marks. But that doesn't survive because, first of all, as we said in the Tam case, because I take the position that the en banc decision in Tam is laws of the circuit, and the Supreme Court has not changed that. And that's topic regulation, which is still subject to strict scrutiny. But the two people I cite for the argument that those marks do express a viewpoint, and therefore are subject to strict scrutiny and cannot be regulated, is Harlan. I mean, Harlan in Cone, California, says it better than I could. Well, except that Cone, California was not commercial speech, and it was not in the context of a government program. Well, but I don't think that makes any difference because that's one of the points of Mattel, is that trademarks do express viewpoints. And in many cases, they express core speech viewpoints. And in fact, if you look at the record in this case, the board found that my client, the reason it says why my client's markers are fused is because he's a misogynist, he's critiquing capitalism, he's promoting nihilism. That all sounds like core speech to me. So if you're talking about my client. And we determined that that trademark was indecent under the Pacifica standard. Would it be permissible for the government to regulate that? No. No. And in fact, it's funny because I've been reading the autobiography of George Carlin, and he talks a lot about Pacifica. And Pacifica was just saying the government can have time and place regulation of indecency. But nothing in Pacifica suggests that the government can prohibit indecency in all times and places. And the trademark office has taken a position here. Well, the trademark office is not prohibiting at all, right? Well, the Supreme Court, I think, has also dealt with that, because that was one of the things we argued last time, is whether denial of registration is sufficiently large that it is the equivalent of prohibition, or certainly it's an unconstitutional regulation of speech. So I think that issue is behind us. Denial of registration is sufficiently significant to be of constitutional merit. Well, but it's not a prohibition, right? No. Actually, that's a good question to ask, because in a sense this statute almost is prior restraint, in the sense that most of these applications are ITUs, intent to use. And almost all of them, when they're rejected, never get used. My client's unique because he's been using it for more than two decades. So basically, one of the ways the restraint on speech works here is people file an application, the PTO rejects it, and they think, because they're not trademark lawyers, they can't use it. And all those ITUs die. So the statute is... So what you're saying is people are reluctant to use a mark unless it can be registered? Absolutely. I mean, you look at the universe of goods and services out there in the marketplace, and virtually everything you see is a registered trademark. But the one argument I think that sort of relates to that is the government implicitly argues we're going to be flooded with vulgar marks. And first of all, of course, registration isn't required that anyone use the marks or that people buy them. But the point of the First Amendment is the free marketplace of ideas. My client's marks are never going to be sold at Walmart or Target. There is a place for his marks, and that's why he's selling them. But there's, for example, when I was younger, Spencer gifts, I don't know if it's still around. And he had a lot of gag gifts for, like, bridal showers and bachelor parties. There is a purpose for that. I mean, Pacifica doesn't say that George Carlin's seven words can't be played on the radio. It just says you can't play them at 2 o'clock in the afternoon. The prohibition of registration limits use for all place and times. The Trademark Office doesn't say you can register your mark only if you spell it as Spencer Gifts, or you can register it only if you sell it on a porn site, because they take the position that it doesn't matter where it's being used. If it is offensive, it can't be used. But see, I think you're missing the key point. It says we're not only talking about profanity. This statute covers all kinds of scandalous stuff. You know, you've obviously got my point. The disparaging is a subset of scandalous. But we also have religious marks. We have, you know, God does not have a penis. Certainly that person is trying to make a point. And that's not just a vulgar point. That's clearly a protected core for speech. Do you think we're talking about just scandalous, or is it scandalous and immoral? Well, the Trademark Office says, well, rarely are marks refused as immoral. And, in fact, the TMEP says that basically virtually immoral is a subset of scandalous. So like I say, there's very few marks dealing with immoral. You know, my client's mark was refused because it was allegedly scandalous. And immoral. It was refused for both. Okay. On the last page of the TCAB's decision, I think it refers to both. So what do you think? Do you think it's being rejected under both grounds? Well, it doesn't make any difference. I mean, it's, I don't, first of all, what business is it of the government to determine morality? I mean, what area of government has, what Supreme Court case says that the government can regulate morality? In Pacifica, the government says we can prevent on the publicly owned airways, dream the hours that young children are listening, things that are indecent. Nowhere in Pacifica or any other case does it say you cannot have scandalous, vulgar, profane marks or words at any other time. So that was just a very narrow time and place limitation. All right. Any other? Let's hear from the government. Thank you. Thank you, Your Honor. May it please the Court. Go ahead. Joshua Selzman on behalf of the PTO. Okay. At a minimum, wouldn't we have to construe this statute to be limited to the category of indecent speech and indecent trademarks in the light of the Tam decision? I don't think that's a necessary consequence of the Tam decision. I think all that the Court has to do today, though, principally before the Court, is a facial challenge. And in considering that facial challenge, what's necessary is to look to whether or not the statute has a plainly legitimate sweep. There is a core of this provision that I think indisputably has a plainly legitimate sweep. That's words like those at issue in Pacifica, graphic sexual images, renderings of genitalia, things like that. And in order to dispense with the facial challenge, the mere existence of that material is enough to resolve the issue. Then for the as-applied challenge, I think the record before the Board was sufficient to establish that the mark sought here is effectively the equivalent of one of those seven dirty words. And therefore, any concerns about future as-applied challenges and the future scope of the provision need not be resolved today. The TTAP's decision suggests that there's two different meanings of the word, and one of them is an nihilism, anarchy, things like that. And that at least there was some evidence from the website that suggested that maybe the trademark was being used in that context. So, like, what if there's a situation, and I don't know if it's satisfied here, but what if there's a situation where the trademark is something more like America is, or the government is, or the world is fucked like that? What is the situation there? I mean, how does – would that – it seems like that would be something that would be considered scandalous and immoral by the PTO. I think it would, Your Honor. Well, why is that not viewpoint? That's not viewpoint because it's being adopted and applied on a neutral level. So if you look at the Second Circuit's decision in Perry v. McDonald, if you say that expletives are unavailable to everybody on an even-handed basis, that is a content-based restriction, but it's viewpoint neutral. Now, it may be that somebody wants to say F the draft or somebody else wants to say F draft dodgers, and those are both viewpoints, but it's equally being denied to everyone. And what the Second Circuit in Perry said is that is not a form of viewpoint discrimination. If you just say expletives, we don't want those in our government program. We're going to set those aside. I understand what you're saying. And similarly, for graphic sexual material – I understand what you're saying, but let me ask you something else. You agree, though, that it's expressive, right? I do, Your Honor, but I don't think that necessarily changes the analysis here. And the example I would give you comes from the Supreme Court's RAB decision where the court was discussing flag burning. And what the court said was, of course, under our decision in Texas v. Johnson, if you pass a statute that says you can't burn the flag as a political statement to disparage, to critique American policy, but if a law is adopted that says no burning anything in this public place and it has the incidental effect of preventing you from burning a flag there, that can be a totally permissible form of regulation. The mere fact that there's an incidental burden on some expressive speech by adopting a permissible general rule doesn't mean that the statute is unconstitutional as applied or subject – Do you agree that this is content restriction? Your argument is it's not viewpoint, but you accept that it is content. Absolutely, Your Honor. Okay. So what is the level of scrutiny that you think we ought to be applying to your non-content neutral restriction? So I think the right framework here is the government program analysis laid out in USAID. And the right way to think about this is whether – Do you agree that we rejected that analysis in our in-bank TAM decision? You did, Your Honor. Okay. So we rejected it in our in-bank TAM decision. Is it your view – I know it's your view that the Supreme Court, at least a majority of the justices, did not reach that issue, even though four of them did. But is it your view that this panel is free to disregard the in-bank holding on that legal point, even though the Supreme Court affirmed and cast no doubt on that holding? Well, I think the relevant question here comes from this Court's 2014 decision in Samson – in Troy v. Samson Manufacturing, where similarly, as in this case, this Court had en banc issued a holding. There the relevant holding was Hyatt v. Capos. There the decision went up to the Supreme Court, which affirmed, and a later litigant came and tried to cite this Court's en banc holding and said, that's still good law. And what this Court held – and the cite, by the way, there is 758 F. 1322. I'm going to be quoting from page 1326 of that opinion – that this Court is bound not only by the Supreme Court's judgments but also by its mode of analysis. So I think the relevant question here is when we look at Justice Kennedy's controlling concurrence – We're bound, certainly, by the Supreme Court's analysis and mode of analysis. But I guess the Second Circuit and Ninth Circuit have both consistently held that if there is a particular holding which the Supreme Court does not reach, those circuits have held that that holding will continue to bind the circuit absent en banc action, even if the Supreme Court decided the case on narrower grounds. Are you suggesting that our precedent is in conflict with those circuits' precedent? I don't think there needs to be a conflict. I'm not familiar with the Ninth Circuit case you're referencing. The Second Circuit case, I assume you're talking about the Kiobel line, where the Second Circuit had held that it had to do with alien tort statute liability, whether or not that extended to a corporation. The issue goes up to the Supreme Court, and the Supreme Court decides the case on completely different grounds related to extraterritoriality. It wasn't analyzing the same issue. It just disposed of the case on an entirely separate ground. Here, by contrast, what we have is the Supreme Court was considering the precisely same grounds. The Second Circuit case I was looking at is Ballantulo v. Ford Motor Company, which is obviously not the same case that you were looking at. The Ninth Circuit case I was looking at was Chen v. Allstate in 2016, and both of them have the Supreme Court deciding fewer than all of the decisions that were rendered below. In both cases, the circuits said, and I'll quote from the Second Circuit case, there's no authority for the proposition that when the Supreme Court affirms a judgment on a different ground than an appellate court, it thereby overturns the holding that the Supreme Court has chosen not to address. To hold otherwise would undermine basic principles of stare decisis and institutional regularity. Right, and I do think that the most relevant precedent here, as I said, is Troy v. Sampson Manufacturing. Ultimately, this Court is going to have to decide whether Justice Kennedy's notable refusal to join Parts 3B and 3C of Justice Alito's opinion. Did he cast any doubt on those? I think he did, insofar as he explicitly reaffirmed. It's either page 5 or page 6 of the slip opinion where he explicitly reaffirms that various forms of content-based discrimination in the context of the trademark program is permissible. So I think that if you look, this is page 5 or page 6 of the slip op, it's at page 6. And I can't say that he expressly concludes. What's the language that you're referring to? What I'm saying is it's well-settled, for instance, that to the extent a trademark is confusing or misleading. Are you reading her hand? Time out. Stop. And slow down. You're going way too fast. I'm sorry, Your Honor. So where on page 6 are you? I have the slip opinion and I have Justice Kennedy's page 6 in front of me. Where are you reading from? I am reading from the full paragraph on the bottom of the page. It begins with, this case does not present that one. It does, Your Honor. But it then goes on in the second sentence to say, it is well-settled, for instance, the law can protect consumers, that to the extent a trademark is confusing or misleading, the law can protect consumers and trademark owners. Now, that's a form of content-based discrimination. First off, both of those are expressly exempt from the First Amendment. Deceptive and misleading trademarks, deceptiveness is one of the clear exceptions to First Amendment scrutiny. And we actually said that in our opinion as well, our in-bank opinion expressly says, exactly these forms of restrictions are, of course, still permitted. So how is Justice Kennedy's agreement with us that these restrictions are permitted, somehow an implicit disagreement with other restrictions that we say are not permitted? I think read in context and with the refusal of half the Supreme Court to join Justice Alito's opinion, I do think there's force to that. But even if you disagree, and even if you think that this Court, that Justice Kennedy's opinion is not controlling and doesn't displace this Court's en banc ruling on that point. What if you just think that Justice Kennedy's opinion is decided on a narrower ground? I mean, I think that's what Judge Moore is saying, is how do you know that it's rejecting and not just deciding the issue on a narrower ground? I think in context that's the best reading, Your Honor. If you disagree with me, however, I'd like to explain why, even if this Court disagrees on that point, we still prevail. Because then I think the right way to frame it then, even if you're not going to think about this as a government program, which I would submit is, I think, the best model, at a minimum, Justice Alito thought that the best analogy might be a limited public forum, where, again, some forms of content discrimination are totally permissible. Okay, but so what is the government's interest here? I mean, that would seem to me to be a pretty key point. Are you relying, for example, on the protection of children, the Pacifica rationale, that has found its way into other Supreme Court decisions about indecent speech? Are you relying on the protection of children? Is that part of this, or is this not part of it? I don't think it's necessarily the protection of children specifically. I think it has to do with promoting a particular form of commerce and making a judgment about the sorts of marks that should be. So you're not relying on the protection of children? There's certainly language. The Supreme Court in Pacifica and then in Sable Communications certainly recognized the government has a strong interest in regulating indecent material for the purpose of protecting children. My question is, are you relying on that interest, or are you not relying on that interest? It's not one we cited to this court, which is— Does that mean you're not relying on it? You are not relying on it? I think that it further buttresses our point that that isn't the primary interest that we've cited here. Answer the question. You have to articulate what the government's substantial interest is in preserving the constitutionality of this. Judge Jake has asked you a simple, straightforward question five separate times, and you have evaded it very unskillfully every time. Answer the question. Is the government's position that a substantial interest that it is protecting by virtue of having this regulation the protecting of children from hearing these words? I think that is an interest that this serves. I do not think that is the only interest. I also honestly don't think it's the primary interest, but that is certainly an interest. What is the primary interest? What the primary interest here is that the government made a decision to promote the use of certain kinds of marks in commerce, and it made judgments about the kinds of marks it wants to promote. And that's particularly significant because this isn't sort of a set-it-and-forget-it program where the government sets up a program and then steps away. Instead, its own examiners are going to have to look at these marks to decide whether they're confusingly similar to others. The government is going to be publishing these marks. It's going to be issuing certificates in the name of the United States. And while that may not make it government speech, the close nexus between the government and this program gives the government an interest in not wanting to associate with certain marks, wanting to promote the use of marks that don't include necessarily this material. So just to be clear, the sum of the government interest that you are articulating as the government imprimatur on the mark, is that really the way you would summarize it? Because your point is that government publishes, although I'm not sure where it is you're publishing it, but you're claiming that you're publishing it somewhere, and the certificate in the name of the U.S., right? So these are the tangible things that you're claiming. And then you said the government doesn't want to be associated with these marks. So is it imprimatur of the government by virtue of the registration? I'm not claiming an imprimatur, but I am claiming that there is an association and a direct involvement by the government in providing the benefits that flow from the trademark program. The government plays a very active role. And if the government does, I think, have an interest in whether or not its examiners are forced to decide whether one drawing of genitalia is confusingly similar to another drawing of genitalia. And that is the kind of limitation I think the government... So it's the protection of the trademark examiners. I think it's... the government is structuring a program here in a way... It would be hard to see that that's a substantial government interest to protect trademark examiners. I'm not claiming that there's a substantial interest in the eyes of the trademark examiners or their sensibilities. But I do think, given the government's very active role in this program, we do have an interest in saying these are the sorts of marks we want to promote. And, of course, what flows from that is also what sorts of marks the public... are going to be used in public, which does tie back into the protection of children. But I think it goes far beyond that to just sort of encouraging the use of certain marks the government has deemed to be most suitable. In Section 2 of the Lanham Act, the government made a number of content-based judgments about the sorts of marks that could be included. The government said, we don't think flags of sovereign nations are the most suitable marks. The government made a judgment about coats of arms. It made... Congress made a permissible judgment about misappropriation of identity. All of these things are content-based judgments. So what, again, is... See if you can put it in the form of a sentence. A single sentence with no commas or semicolons. What is the government interest? Congress's primary interest is the promotion of the use of non-scandalous marks in commerce. But there are... So the government interest that is being protected here by banning these marks is the promotion... I want to write it down just like you said it, because it didn't come across clearly in the brief. So I want to make sure I know this substantial government interest. The promotion of non-scandalous marks in commerce. That's the government interest? That is certainly a primary governmental interest here. Is there a second primary government interest? Sure. Well, the other one we referred to in our briefs is traceable to sort of a history of public morals legislation that goes way back in the common law of having the government promote certain values. And that is something the government has reasonable authority to do. I'd emphasize here that this isn't a situation... So wait, the second one... I'm just trying to understand. You're using a lot of words, and yet I have trouble understanding precisely the nature of the government interest. So see if you can bite-size it for me. What is that second government interest? I want to make sure I get each of these down. So what's the second one? So the second one is the public morals, the promotion... Public morals. Yeah. Okay. Public morals? I mean, what does that mean in this context? I'm not sure who knows. You're just talking about the use of particular language. You mean it's to protect people from immoral language? What are we talking about? It's not protecting people from immoral language. What it is is it's promoting commerce that doesn't include the use of source identifiers that are graphic sexual images or profanities that are going to be off-putting to a substantial subset of the public. Okay, but that was your first one. Your number one was promotion of non-scandalous trademarks in commerce. Then you said there's a second primary interest, which you said something has to do with promoting morals. And so just like he's trying to follow up, and your answer was to repeat the first one again. So how is the second one different from the first one? I'm not sure that they separate entirely, Your Honor. I think that the history of public morals legislation, which is recounted in Justice Rehnquist's opinion in Barnes v. Glenn Theaters, does provide additional context for why a statute like this... In Barnes, it was a public nudity law. It was a law restricting public nudity. But this is a restriction on trademark registration that dates back to 1905. And there's a long tradition in this country of allowing governmental programs to impose limits that exclude sexually charged material, that exclude profanities. And I think that is somewhat rooted in this common law tradition. I think the interests go well beyond just sort of that historical tradition. But I do think that further informs what I'm saying here about why the government has chosen to promote the use of some marks in commerce as source identifiers, but not these. Can we go back for a second? Did you give me a clean answer, because I just checked back on my notes, and I don't see it written down, about what the level of scrutiny is for this content-based restriction? What is it strict scrutiny? What I'm trying to get from you, what is the test that you believe I ought to be applying to the restriction to assess its constitutionality? Sure, Your Honor. I think there are, and it depends, whether you disagree with us on sort of the headline argument, and then there are potential fallbacks. Our general position is that this is a content-based limitation on a governmental program, and that the relevant test comes from USAID. Now, I understand the panel may think that that view is foreclosed by the en banc decision. Failing that, I think... Or just possibly wrong. Or possibly wrong. Like we always did in the en banc decision. Yes, Your Honor. Failing that, I think the right framework is then to look at this, something like a limited public forum. That case law that... Okay, now, I'm trying to figure out how this could be a limited public forum, because you used those words several times in your brief, and I have surveyed every single public forum case of the last several decades, and I am having trouble understanding where in the limited public forum is here. Most limited public forum cases I read were the plaza of the Supreme Court, a military base, a prison facility. You see where I'm going. They are places. They are pieces of property, and a decision is made, was that meant to be an open and public place of property, or was that meant to be a limited place of property which gives the government a greater ability to therefore regulate speech in that space? Is that a fair assessment of your understanding of those kinds of cases? It's not, Your Honor, because the Rosenberger case from the Supreme Court back in the mid-'90s referred to a fund as being a forum that was more metaphorical than... I don't remember the alternative. I think it was tangible. But the Supreme Court has recognized that a limited public forum can just be a metaphorical construct. And I note that Justice Alito... The reason we spoke so much about limited public forum in our brief is because Justice Alito was the one who raised that analogy. Again, we continue to think that the best way of thinking about this is a government program. But we're saying if you don't think that's right, if Justice Alito, for example, suggested that that was the right mode potentially to be thinking about this through, then I'm just trying to offer how that case law would apply. How? What is the limited public forum? It would be the trademark registry, Your Honor. Okay, and I asked in the panel, and then I asked in the in-bank, what's the trademark registry? It's a database, Your Honor. An electronic database. That's correct. Where is it located? Do you want a URL, Your Honor? Am I able to access it from the PTO website? I believe so, but I can't confirm that right now. So it's a database? That's my understanding. And so what about... So does that mean a database registering all land in a county is also a limited public forum, and therefore the government can control speech in that database? Absolutely not, Your Honor. And I think the key difference there is the application of the unconstitutional conditions doctrine, which is the significant constraint on the government's ability to abuse its power over something like a land registry to influence speech outside a program. And again, the USAID case provides the relevant framework for assessing whether or not the unconstitutional conditions doctrine would apply here. And do you have a better answer, possibly now, than the government had a year or so ago to why all of this wouldn't apply identically in copyright cases? Yes, Your Honor. It couldn't have gotten worse, so surely you had a better answer. Go ahead, or at least the same answer. So the reason the copyright example has such force is because copyright's the engine of free expression. Everybody reacts to copyright so strongly and says it would be completely impermissible to do this in copyright, I think, because everybody knows that copyright has this unique function of promoting expression. And there's doctrinal significance to the fact that the copyright program is an engine of free expression, while the trademark program is principally about promoting source identification of goods and commerce. And where the rubber meets the road on that is in the USAID context, because what USAID says is the government, as a starting point, gets to say, these are the purposes of our program. But USAID also recognizes that you don't want that to become a tautology, because otherwise the government could always read into its programs and say, oh, one of my additional conditions is something that really just reaches outside the program and is trying to leverage the program for improper purposes. So what USAID says is, and both Alito and Kennedy's opinions in TAM reference USAID, and Kennedy says it's a complex analysis. Alito says it's tricky. It's bound up in the facts of the very particular program at issue. I think when you're talking about a program like copyright that's the engine of free expression, if you try to say no scandalous copyrights, that would be so in tension with the primary purpose of the copyright program that a court might well under USAID say, that's impermissible, that's an unconstitutional condition because what you're doing here is really reaching outside the program. Because trademark serves a very different commercial function, I think Congress has more latitude to make judgments about the kinds of marks it thinks are suitable or best suited. How much does the government rely on the fact that we're dealing with commercial speech here? I mean, for example, if in Cohen v. California, instead of trying to ban the T-shirt that said, fuck the draft on it, they had tried to register that as a trademark so that they could sell shirts to raise money for the cause, whatever the cause was. Would that, in your view, be a permissible thing for the trademark office to do to say we're not gonna allow you to register that mark? I don't think you need to reach that question today, but truthfully, I think that it would be permissible to deny that mark because, again, I think I was speaking a little while ago about the Texas flag burning example. And the idea is when the government adopts a neutral rule, it's viewpoint neutral, it's permissible, even if it has an incidental effect on expression, that doesn't mean that the rule is impermissible or even unconstitutional. So they can discourage it as long as they don't prohibit it? Well, if they're not targeting it. I think some of this goes down to targeting, and that's what RAB speaks directly to this sort of problem. And what it says is if the government is adopting, for a permissible purpose, a neutral rule, the fact that it may, in some contexts, burden expressive speech doesn't mean, as long as the government wasn't targeting that speech, wasn't engaging in viewpoint discrimination, or wasn't going out to target that speech specifically. Wait, but you are targeting speech. This is not a content-neutral restriction. It's certainly not content-neutral, but it's viewpoint neutral. Well, okay, but it's not content-neutral. If I said content-neutral, then I misspoke, Your Honor, and I apologize. So what does the commercial advertising nature of this have to do? Let's assume, and I know that Brunetti argues otherwise, but let's assume that there was no claim here to an expressive component of this. This was just purely commercial advertising. We sell more clothes if we use an indecent logo, because it is attention-getting. Is that part of the government's argument, or not part of the government's argument? Yes, we have argued central Hudson, and to the extent that you don't agree with us on these alternative frameworks, then I think the next place you end up is with just sort of a straight central Hudson analysis, because this is commercial speech, and therefore, we need an interest. We spent a while with me trying to articulate the governmental interests served here, and I do think there's sufficient tailoring to survive central Hudson review. How is it narrowly tailored when it could exclude things like F the draft? How is, I mean, I'm having trouble with the narrow tailoring, or something where, or maybe the idea is that there's certain words you could have, like but, but you couldn't have as, for example. I mean, so how is it narrowly tailored? So I think in the tailoring, the relevant question, the test that PTO has been using is, is a substantial composite of the public going to react to this as vulgar, and that's the test this court repeated in Fox. That's where, that was affirmed in Fox, and that's the test PTO applied here, and I think there is, because PTO is not making its own subjective judgments about this material, and is doing its best to make a judgment about how the public at large will react to this mark, I do think that that's closely tied to the government's interest in promoting a particular kind of commerce. I mean, do you agree that at least Judge Alito's opinion rejects the government's USAID argument here? I would agree, though Justice Alito holds that it's not a government program, yes. Do we have anything more? The Supreme Court uses the words offensive or offended, offending speech 21 times. They span all of the opinions that it issued in this case. It's something that we brought to your attention in the order that we issued. Certainly the word offensive in the Supreme Court opinion is broader than just viewpoint discriminatory speech, isn't it? I do not agree with that, Your Honor. I think in context, it very much was speaking to viewpoint discriminatory, because I think in context, what the Supreme Court said is, if there's an otherwise includable subject, and there are two positions on that, and one perspective is offensive and the other perspective is not, you cannot exclude one perspective on the grounds that it's offensive. But there's a raft of precedent from the Supreme Court and from the Court of Appeals we've cited in our brief, that speech isn't uniquely privileged because it has profanity in it, because it has nudity or sexuality. And I don't think Tam can fairly be read to cast doubt on all of that. I think offensive there means offensive viewpoint, not offensive subject matter. And indeed, if the Court had meant that, then the government entities would lose all power or would face huge obstacles to preventing profanity from being printed on the side of press advertisements. I think in context, and especially in light of the list of cases that Justice Alito cited in supporting that point, all of them get to a fundamental idea of the government trying to target one side of the debate, and that's not what's happening here. What is your test for scandalous... Judge Dyke had suggested that perhaps the word scandalous and immoral could be narrowed so as not to embrace anything that would clearly be out in light of the Tam decision, for example. What is your view of what the legal test for when something is scandalous or immoral ought to be? Because that was the rejection here, scandalous or immoral. So what is your view of what that test is? So I think at a minimum it reaches the stuff that Judge Dyke was asking about at the very beginning of the argument. At an absolute minimum, I think it covers the kinds of words that were in Pacifica, graphic depictions of sex, genitalia, material like that. I think we know from Tam that what it cannot properly reach is material that's merely disparaging. And accordingly, something that is disparaging is protected because if you target it on that basis it would be viewpoint discrimination. But I do think there's a permissible core of this provision. I think PTO's test, to the extent that it doesn't reach material just for being disparaging, the test that the PTO has long applied and this court endorsed in Ray Fox is acceptable. So your opponent used a trademark God does not have and then it's a male genitalia basically, right? That is a trademark that was rejected as immoral or scandalous. Are you saying that the government can reject the word penis every time it's ever used? What if it's for a penile implant or something? You can see there are less offensive uses of the word to the average person. I understand the word F-U-C-K banned. Nobody can use it. America is F-U-C-K. You can't use that word ever anywhere. But what about breast or body part language because some of those are rejected and others are not? We did our own little survey. We pulled every single rejection for immoral and scandalous over the last several decades and it was shocking the level of inconsistency among the rejections versus acceptances of same words like that. I get F-U-C-K but what I'm trying to figure out is what's the test? Because you know what? If I decide F-U-C-K, that's helpful in this case but it's not helpful to the PTO and all the examiners who are going to have to decide every other case which nobody's going to apply for F-U-C-T after this. You know what I mean? And so I'm trying to understand what that means. What do we do if that God doesn't have a finger in his hand? I do think that the relevant test has to be to look at that mark in the context of the goods or services as PTO always does when it evaluates a trademark and make a determination about whether it falls within this provision and I understand to the extent the court has concerns about past consistency, I think it bears note that PTO has been operating for 35 years against the backdrop of a holding of this court's predecessor that there wasn't a due process implication to this. That PTO certainly endeavors to have its results be as consistent as possible but when you're dealing with as many applications as possible... But forget about the inconsistency for now. That wasn't meant to be the focus of my question. It was more meant to be how do I understand the words scandalous or immoral and their coverage? How are those tests going to be applied? Because for example I understand the word F-U-C-K is off for anybody under any context. Doesn't matter if you're saying something's good about it, something's bad about it you just can't use that word but the word penis gets used so how come it can be used in some circumstances but not others or are you saying it should never... Do you agree that the government has to block the word entirely or it can allow it in some circumstances and not others? I think you can make a judgment based on the goods or services as to how the mark is going to be understood. So for example if there is... In either case the word penis means male genitalia. There's no question about how it's going to be understood. That's what it means. It always means that. This isn't like some wordplay friends you can trust nonsense or whatever. So this is... It means the same thing. Every time it's used, sometimes it's used in a medically appropriate way or whatever else. So you said content means you can never use it. You can't use it positive, you can't use it negative. That's... But that doesn't seem to be the case with things like that. So what... How do you justify that or explain it? I think to the extent that it's necessary to construe the statute more narrowly in order to preserve it as Judge Dyke was saying that that's certainly something that it would be appropriate for this Court to do. Well I mean that sort of distinction has been made under the Pacifica case at the FCC between uses of these words that's indecent and uses that are clinical or merely descriptive. And I do think that is something that PTO examiners might well be positioned to do but if this Court was concerned about the outer reaches of it, my primary... My primary concern would be to make sure that this Court preserves the core and doesn't throw the baby out with the bath water in issuing any ruling on that. Well what... There just seemed to be a silo of rejections when we did our survey that I would call of a religious nature. It seems that a lot of things are deemed immoral or scandalous like Madonna for wine that you know are... It seems like the more likely a mark is to have some religious potentially be offensive to a group within a religion, the more likely it is to be immoral and scandalous. It seems like there were silos, right? There's the sex marks and then there's I'll call them the blasphemous marks. And so I'm wondering about those blasphemous marks and whether or not they are still within a constitutional view of scandalous and immoral definition. I don't think it would be appropriate in light of Tam for the government to be issuing viewpoint-based denials of those marks, but I think I'm hesitant to opine on blasphemous marks as a category. I think each of those marks would need to be considered in light of the specific record in the goods and services. So if the government under Cohen against California doesn't have an interest in suppressing the use of indecent speech insofar as it's directed to adults, forget about children, why does it have an interest in discouraging it? I think the right way to think about this is just promoting the use in commerce of non-scandalous marks. Cohen's distinguishable in a couple of ways. One key thing to bear in mind about the Cohen case, and the majority in Cohen took pains to stress this, is the rule there didn't say you can't wear the profane jacket in the courthouse. The rule said you can't wear that profane jacket anywhere in public in California. And the opinion even suggests if the rule had been you can't just wear that in the courthouse, that it would be a very different case and the outcome might be very different. Here, similarly, we are not saying you can never say these shirts, you can never call your company something. But if you are going to participate in the Federal Trademark Registration Program, these are the criteria for participation. Do you agree with opposing council's analysis of Pacifica that it isn't prohibiting those words, the filthy words, it's a time and place restriction? My recollection is Pacifica does apply on its terms to specific hours of the day. Like 2 o'clock in the afternoon? And the rationale, and do you also agree that the Supreme Court in that decision went to great planes to explain how broadcasting is different than other things because broadcasting comes into your home whether you invite it or not really, it's there, it's coming across in your living room, you can't really avoid it at 2 o'clock in the afternoon if you don't know it's coming and there it is, right? How, given the narrowness, if that's your understanding as well, given the narrowness of this decision which didn't prohibit the broadcasting of these words in general, but only in a very narrow space because of the desire to protect children, how does a trademark registration scheme which rejects them altogether comport with the Supreme Court's very narrow and clearly delineated limited view of the prohibition in Pacifica? I don't think you can just read Pacifica as confined to its facts. There was an analysis of these materials as generally lacking in scientific, political, or artistic merit. There's been repeated descriptions of them by the Supreme Court as lying at the outer periphery of the First Amendment and to be sure, in Pacifica one of the factors was the fact that it invaded the home, but that wasn't, if you look at the Supreme Court's actual analysis and then how it's been repeated in cases like FCC versus Fox, I don't think you can read Pacifica confined to that context. Again, I think the trademark program, it's important to remember how limited this way. We are not going out in the world and banning any speech at all. Mr. Brunetti can say anything he wants to anywhere he wants to. He can put any message he wants to on a t-shirt. He can call his company anything he wants to. But you would have to agree, wouldn't you, that banning the trademark has the effect of restricting the speech in the United States? Well, I don't think that trademarks are not likely to be used pervasively if they can't be registered. There may be some incidental effect, but again, even if Mr. Well, it's more than incidental, isn't it? Because where you have efforts to register indecent trademarks and people are not able to register the trademark, they basically don't find that it's commercially feasible to use it, right? There are certainly significant benefits that flow from trademark registration. I think that producers are likely to pick those marks that they'll be able to get federal registration for, yes. But all that's to say I do think the fact that there's no ban on speech here is relevant, and certainly that Mr. Brunetti can put any message he wants on a t-shirt, and as long as he picks something that comports with the standard set by Congress, he can register that trademark. Okay. Anything more? Okay. Thank you. Mr. Sumner? Thank you. I'm going to sort of jump around because we've been sort of jumping around, but I have some points I want to make. It says I agree that we look not only at the Mattel's decision, but also its analysis, and its analysis was quite simple. You can't refuse a trademark because it's offensive. The point about explicit pictures of genitalia... I don't think the Supreme Court in using the word offensive in that context was talking about offensive in the sense of indecent material. They said again and again we're not reaching other provisions of the Lanham Act. Absolutely, but... I don't think they were deciding our case. No, they were not deciding our case. That was not the decision. It would have been dicta if they had. But the analysis makes it absolutely clear that offensiveness of the listener is not grounds to refuse a registration. But we can look more specifically. The government argues about explicit materials. Nothing that I'm suggesting that illegal and obscene materials are illegal. And so there's nothing to suggest that those should be registered. The government talks about the purpose of the statute. I always thought the purpose of the trademark statute was to protect consumers from confusion and to protect the rights of trademark owners. This provision, from what little legislative history we have, was because they didn't want to have Abraham and Lincoln associated with Gen. So it's basically... And that's the speech component that we have today. The government's arguments as to compelling interest, I guess it's dropped the interference with commerce argument that made it spree. And the interest in the public morals, I don't know what other area of government where morals are... The U.S. government is trying to regulate the morals. Besides what are morals, who's going to figure them out? And in fact, that's clear from the Supreme Court jurisprudence from Pacifica that they weren't trying to regulate the morals of the government. Dancing, pornography, there are lots of things that are immoral that are constitutional. The argument here would be that if you register something as a trademark, it's going to be pervasively distributed. It's going to be all over billboards and magazines and the internet. Well, that's a good question to ask. Wait, wait, wait. So, does the government have an interest in not promoting that kind of pervasive dissemination of indecent material? That is not its role. And Pacifica makes it clear that that speech and that people have the right to make that speech and it's not the government's role. I think the analogy for copyright is the exact analogy. And the government tries to make it different. And they did start from sort of different premises. But in both cases, because you compare Muslim Patriot with Stop the Islamization of America, exact opposites, clearly both are expecting these viewpoints. Trademarks range from purely commercial, like Exxon, I guess, all the way up to ones that are clearly inextricably intertwined with the organization, especially like with non-profit and political organizations, the trademark is inextricably intertwined. Then you have copyrights, O's and 1's for software, all the way up to James Joyce and the political speeches. So, neither are one or the other. And in fact, both statutes are the same. And this is the important point that in my very first brief I talked about the state of Pennsylvania refusing to register a corporate name that says I Choose Health Productions LLC is this is merely an administrative statute. You check the boxes, you get a registration. The government is not like, for example, in some other countries where the government actually promotes one industry. This statute is just to create a lane playing field for everybody to play on. And it's never intended to do anything. In your case, do you agree that what the government is doing is regulating the expressive component of your client's speech because it has chosen to prohibit it precisely because it views it as having an offensive word? Well, yes. Regardless of what your client intended the word to mean or not mean, the government is really going straight after the expression, the nature of the expression. Well, it is going after the expression, I grant you that. And the record below says that. And it's not only what his word by itself says, but it's also everything that the board found was related because you take the word pussy that's sometimes refused, sometimes granted. So you have to look beyond just those words. Or slants. Slants could be something completely innocuous or it could be something disparaging. So you have to look at not only what the actual word itself that's being sought to register, but the broader picture. And so, clearly, he's being refused registration because of that. But that sort of raises the question you ask is, how can the statute be narrowed? And, well, first of all, I don't think it can be. Because it includes all the religious things and that, frankly, it brings into freedom of religion issues because the government has to be picking sides. We could say that it has to be limited to indecency, which doesn't incorporate blasphemy. But that isn't what the statute says. And, I mean, basically what you're saying is we should say that it's the seven dirty words. That's, in effect, what the government's saying. That would be a possible construction of the statute if it would avoid constitutional... Well, they're saying a little broader what I call the PES words. But still, I mean, first of all, you have the point that it's overbroad and it's vague and, you know, the history, I mean, in my brief, I attached many examples and I assume you found many examples. So, if we narrow it, I know you think we shouldn't, if we narrow it, why is it not constitutional? Well, because, two reasons. One is because it grants unfettered discretion to the PTO. And we've had 70 years of experience, and why should we think that all of a sudden the PTO can get it right and be logical? It's a different standard than they've been working with. And, moreover, it's expression. You know, in the Embank decision, the government's basically arguing it should be topic regulation. That still should be strict scrutiny. But even more so, my client is expressing the view this is no different than Cohen versus California. And this isn't a restriction like Pacifica, where it's at 2 o'clock in the afternoon, not the rest of the day, and only meant because that's children and cartoon watching time or something. This isn't a narrowly tailored regulation. This is the government can prohibit its trademark, and therefore, anywhere. All times, every place. Any time, any place. Yeah, and not that I'm supporting pornography, but they take the position that you can't use bad words in connection with pornographic websites. And so, this is not Pacifica. This is so much further than Pacifica that it's unimaginable the government can be arguing that. Well, I mean, I guess the counter-argument is that it's not that broad because there are, there is a possibility of using the mark without the federal registration. Well, I thought that issue we've taken care of in Tam and in Mattel, that the burdens on the person who doesn't have a registration are so significant that it is of the same constitutional significance. And, you know, when I was here the last time, I argued many of those things, and I don't really need to repeat them, but, I mean, I think it's clear from the Supreme Court and from the en banc decision that the Court believes that the refusal to register is very significant. Can amount to a prohibition. Yes. Um, the government cites Perry. I don't think that's the right case. Bad Dog is the Second Circuit dealing with the exact issue here. And not only do we have Bad Dog, that there's the, this could be extended, if this is constitutional, this can be extended far beyond, and like, there's a case out of the Second Circuit that I cited in my amicus brief in the Supreme Court, I don't know if I cited it here, where the government said, we'll give you a building permit for your restaurant, but you have to change the name so it's not Sambo's. And so if this provision is constitutional, then states can start doing their own regulation. The, you know, the District of Columbia could say, we are not going to allow you to sell products with four-letter words, even if it's in a gay gift store like Spencer's. And the, so local governments, I mean, you know, if you're trying to narrow it really to just to the seven bad words, my argument's a little bit less sexy because, you know, more broadly, local governments could de facto prohibit Planned Parenthood or pro-life because they think it's scandalous. And so I think we have to look at the whole statute. It is scandalous. I don't see how we narrow it to the seven dirty words or profane, excruciatory, sexual unless Congress decides to do so. And the statute, as written, is facially unconstitutional, it's vague, it grants unfettered discretion to the PTO, and it is prohibiting the expression of viewpoints. My client is so unique in that he's been using his mark for more than 20 years. Everybody else just gives up. But, you know, when I tell people, you know, the two people I really rely on is Justice Harlan, and like I say, I quoted exactly what he said, which probably bears repeating, is some words have dictionary explanatory definitions like revolutionary, you can explain, but other words have an emotional expression. And my, and so that is, he says that's emotion, that's protected speech, that should be protected. I think we're about out of time. And then just real quickly, I mean, George Carlin made it very clear that he was commenting on, and that's one part of the decision in Pacifica that I would agree on, that, you know, George Carlin was not trying to make a view point, and I think he obviously was. Thank both counsel in case this concludes our session.